**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4009-19

IN THE MATTER OF HARTZ
MOUNTAIN INDUSTRIES
WATERFRONT DEVELOPMENT
INDIVIDUAL PERMIT NO.
0911-01-1001.12; LUP190001.

_____

Argued March 15, 2023 – Decided December 9, 2024

Before Judges Accurso, Vernoia and Firko.

On appeal from the Department of Environmental
Protection, Permit Nos. 0911-01-1001.12;
LUP190001.

Martin R. Kafafian argued the cause for appellant
Rock Eagle Properties LLC (Beattie Padovano, LLC,
attorneys; Ira E. Weiner, of counsel and on the briefs;
Jason A. Cherchia and Martin R. Kafafian, on the
briefs).

Jason T. Stypinski, Deputy Attorney General, argued
the cause for respondent Department of Environmental
Protection (Matthew J. Platkin, Attorney General,
attorney; Sookie Bae-Park, Assistant Attorney
General, of counsel; Jason T. Stypinski, on the briefs).

Neil Yoskin argued the cause for respondent Hartz Mountain Industries (Cullen and Dykman LLP, attorneys; Neil Yoskin, on the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

Third-party objector Rock Eagle Properties, LLC, timely appealed from the waterfront development individual permit issued to Hartz Mountain Industries on May 21, 2020, by the New Jersey Department of Environmental Protection for two new fourteen-story high-rise residential towers attached by an integrated six-story garage in the Lincoln Harbor section of Weehawken on the Hudson River. In its merits brief, Rock Eagle contended the structure Hartz proposed encroached on the Hudson River Walkway conservation restriction the Department had imposed as a condition of a prior waterfront development permit issued to Hartz, which Hartz had never recorded, that the Project failed to comply with the Coastal Zone Management (CZM) High-Rise Structures Rule, the Traffic Rule, and the Filled Water's Edge Rule, and that the Department erred in measuring the riparian zone and in its treatment of an existing parking lot.

Reviewing the record following receipt of Rock Eagle's brief, the Department discovered Hartz's site plan did not accurately depict the

2

conservation restriction area.  It claimed, however, that "the current permit application and record" lacked sufficient detail to allow the Department "to determine whether any encroachments in fact exist and, if they do, whether the encroachments would violate the correct conservation restriction area and associated Hudson River Waterfront Area Rule."  The Department accordingly made a motion for remand "to further develop the record and reconsider the [permit] application in light of the Hudson River Waterfront Area standards, including the arguments raised by Rock Eagle."  The Department urged we "not retain jurisdiction as Rock Eagle will maintain its appeal rights upon completion of the proceedings" and "the matter may be resolved by the agency without the need for further judicial intervention."

Hartz objected, claiming the "facts" on which the Department based its belief that a remand was warranted "appear not even to be accurate."  Claiming a remand exposed it "to open-ended and vaguely defined procedures," it asked us to deny the remand or, at least, limit its duration.  We granted the Department's request for remand to allow it "to address, on appropriate notice to appellant Rock Eagle and any other interested parties, the encroachment questions and other issues identified in the DEP's remand motion," but retained jurisdiction, giving it 128 days, until March 15, 2022, to complete the remand

3

and issue any revised final agency decision. We allowed Rock Eagle the opportunity to file a supplemental brief, post remand, addressing the remand outcome with any supplemental appendix.

On remand, Hartz submitted additional information to DEP, which included a revised site plan dated January 27, 2022, new street and aerial drone photos with superimposed renderings of the project taken from nearby residential buildings and roads, as well as a new traffic study dated December 2, 2021. On March 10, 2022, five days before expiration of the remand period, DEP issued a Remand Report determining the supplemental information submitted by Hartz on remand demonstrated the project's "compliance with the traffic rule at N.J.A.C. 7:7-16.12, high-rise structures rule at N.J.A.C. 7:7-15.14," including that "the project complied with N.J.A.C. 7:7-15.14(b)(4) because the proposed high-rise structures do not block the views currently enjoyed from existing residential structures, public roads or pathways to the maximum extent practicable," and the public access rule at N.J.A.C. 7:7-16.9. It also determined there was no encroachment on the conservation restriction area.

Nevertheless, DEP required Hartz to "submit" an application for "an Administrative WFD (Waterfront Development) Upland IP (Individual Permit)

4

modification" pursuant to N.J.A.C. 7:7-27.6 and 27.7, in order "to incorporate [the] additional conditions gathered from [the] supplemental information" relating to traffic, specifically the December 2, 2021 traffic study that Weehawken Township engineers prepared in coordination with Hartz's traffic consultant, which concluded improvements at two locations (19th Street and Waterfront Terrace) were needed to maintain the existing "D" level of service, and the creation of a conservation easement. On March 16, 2022, the day after expiration of the remand, the Department published notice of the Remand Report in the NJDEP Bulletin providing a thirty-day comment period.

Rock Eagle contends the Department exceeded the scope of our remand order by accepting and reviewing new documents from Hartz prepared during the remand that went beyond the encroachment on the conservation restriction area, specifically those documents supporting the project's compliance with the CZM High-Rise Structures and Traffic Rules. It challenges the findings in the Remand Report, arguing the agency's actions were procedurally improper, and its conclusions erroneous based on unverified, unreliable information as a result of the Department having failed to afford Rock Eagle and other interested parties any reasonable opportunity to submit their own comments and data challenging the new documents.

5

Although we certainly understand Rock Eagle's position that the remand should have been limited to the encroachment issue based on the Department's motion, we conclude our order afforded the Department the leeway to address "other issues identified in the DEP's remand motion," which, as the Department notes, included a request it be allowed to "further develop the record and reconsider the application in light of the Hudson River Waterfront Area standards, including the arguments raised by Rock Eagle."

That grant was conditioned, however, "on appropriate notice to appellant Rock Eagle and any other interested parties," which we likewise reasonably interpret as dependent on the extent of the Department's further development of the record on remand and reconsideration of "the application in light of the Hudson River Waterfront Area standards, including the arguments raised by Rock Eagle." Although we agree with the Department that it did not enlarge the substantive scope of our remand order by reevaluating viewshed and traffic impacts in addition to the encroachment issue, its failure to do so with only constructive notice in the NJDEP Bulletin to interested parties, including Weehawken, Hoboken, Hudson County, and all individuals and entities who had previously submitted comments to the Department about the project, and that only after the fact, thus depriving them of any opportunity to comment

during the remand period, failed to provide those parties "appropriate notice," or, indeed, any notice at all.  The Department's actions on remand violated our order and were, thus, ultra vires.  We accordingly reverse the Department's decision on remand and vacate the waterfront development individual permit issued to Hartz as well as its modification.

Hartz owns approximately 12.93 acres, which includes approximately 10.73 acres of open water (measured below mean high water) and approximately 2.20 acres of land area (above high water) between Harbor Boulevard and the Hudson River, immediately north of Hoboken, specifically identified as Block 34.03, Lots 1.01, 1.02, and 2.03 on the Weehawken tax map.  The property, part of Hartz's larger Lincoln Harbor redevelopment project, is bordered to the north by Harbor Boulevard, to the east and south by the Hudson River, and to the west by an elevated section of Park Avenue.  The property is one of the last undeveloped parcels within Lincoln Harbor and has unimpeded views of the Hudson River and the New York City skyline.

Rock Eagle owns a high-rise multi-residential development at 1700 Park Avenue in Weehawken, which is within two hundred feet west (landward) of Hartz's property.  The view of the New York City skyline from Rock Eagle's

building, like those of Hartz's other landward neighbors, will be restricted by the project.

According to Hartz's consultant, Bohler Engineering:

> Lincoln Harbor is the largest full mixed use development on the New Jersey Hudson River Waterfront. As originally conceived and as developed, Lincoln Harbor contains a broad mix of uses including offices, retail, residential, hotel, marina and recreational uses. The development provides a full range of services not only for its occupants, both business and residential, but for the residents of the Township of Weehawken, the County of Hudson and the State of New Jersey through the extensive Park and Waterfront Walkway system that has been constructed. Since the issuance of the initial Waterfront Development Permit, the majority of the Lincoln Harbor improvements have been constructed and are in service.

The property is located within the Hudson River Floodplain at an elevation of NAVD88 12.00-feet, although the elevation of the existing parking lot is only between 7- and 9.5-feet. DEP's Bureau of Urban Growth and Redevelopment issued a flood hazard verification in 2017 for Block 34.03, Lot 2.03, finding it "completely located within the limit of moderate wave action" in the tidal flood hazard area of the Hudson River "with a flood hazard elevation of 12 feet NAVD and partially located within the V-Zone with a flood hazard elevation of 16 feet NAVD." "The flood hazard area of the

Hudson River was established using Method 2 (FEMA Tidal Method) as described at N.J.A.C. 7:13-3.5, which is based on the FEMA flood mapping." The Bureau further found "[t]he riparian zone extends 50 feet from the top of [the] bank of the Hudson River located along the eastern property boundary of the site."

The Department, which oversees development along New Jersey's waterfront pursuant to the Waterfront Development Act, N.J.S.A. 12:5-1 to -11, and the Coastal Zone Management Rules, N.J.A.C. 7:7-1.1 to -29.10, had previously approved Hartz's application for a waterfront development (in-water) individual permit in November 2010 for construction on Block 34.03, Lot 2.03, including a portion of the Hudson River Waterfront Walkway built over the water on pilings. Special Condition No. 9 of the permit required Hartz to record a conservation restriction that included a minimum thirty-foot easement or right-of-way for that portion of the Waterfront Walkway. Hartz completed the proposed portion of the Waterfront Walkway but has never filed or recorded the required conservation restriction.

Hartz submitted its initial waterfront development individual permit application to DEP in April 2019, seeking to construct two eighteen-story high-rise residential towers in the northeast and southwest corners of the

property with 334 residential units, attached by an integrated seven-story, 398-space parking garage with roof deck and pool, set back fifty feet from the mean high water line perpendicular to the Hudson River and separated from it by the existing waterfront walkway. When Hartz submitted its permit application, there was an old asphalt parking lot surrounded by a chain link fence on the site likely constructed in connection with the former nearby container port operations. Lot 2.03, the largest of the parcels, contained most of the parking lot and fencing along with a portion of the Hudson River. Lots 1.01 and 1.02 were semi-vacant lots adjacent to the elevated section of Park Avenue.

Hartz served formal notice of its application to the Township, the County, Hoboken, relevant utility companies, and all property owners within 200 feet, including Rock Eagle. The Department received hundreds of objections and requests for public hearings, which it did not convene, including from Rock Eagle and its consultant, Thonet Associates, Inc. Thonet complained about Hartz's failure to fully comply with public notice requirements and raised substantive concerns including flooding, stormwater management and decreased stormwater quality, the existing parking lot, and compliance with the CZM Rules on filled water edges and high-rise structures.

A-4009-19

Most other notified objectors complained about the project's adverse impact on the daily traffic gridlock on the roads through and surrounding Lincoln Harbor, and that the height and positioning of the towers would significantly obstruct their current views of the River and the New York skyline from other residential buildings and public roads, with some claiming the height and position of the towers would even diminish the views of New York City from the Lincoln Tunnel Helix. Other objectors complained the towers, may "technically satisfy the DEP requirement for a rectangular building," but are plainly closer to "cubes" dozens of feet higher than the surrounding buildings in Lincoln Harbor and nearby Hoboken, thus failing to honor "the intent of the regulation." Some objectors also complained about how close the buildings would be to the waterfront walkway, with almost no separation between the two. One specifically complained that there had not been any traffic studies of the area, which "will be further stressed" from the then-imminent opening of a new Whole Foods market and a soon-to-be-completed 565-unit condominium complex, "both part of the Lincoln Harbor development effort."

On January 22, 2020, Hartz submitted a revised individual permit application seeking a "WD-IP Residential not SFH/Duplex (Upland/Landward

11

of MHWL)" for the property, this time including Lot 4.21 which encompassed a portion of Harbor Boulevard, which Hartz owns. Hartz proposed two fourteen-story high-rise towers situated diagonally on the site as before, each 109-feet tall for a total of 259 residential units attached by an integrated six-story parking garage with 323 total parking spaces, along with pedestrian sidewalks, related hardscaping and landscaping, and site improvements to Harbor Boulevard (thus the inclusion of Lot 4.21). The sixth story of the proposed garage would be 70.02 feet above the pre-existing ground elevation and provides a twenty-four-foot gap between the towers from that level up. Hartz had also updated its plan "to reflect [an added] walkway along the southeast edge of the building within the 25-foot riparian [zone] to provide additional public access to the [Hudson River Waterfront Walkway] as requested by the Township of Weehawken."

Included with the revised application were new supporting and revised documents prepared by Bohler, including preliminary and final site plans and an environmental impact statement/compliance statement, as well as a traffic impact study prepared by Hartz's consultant, Michael Maris Associates, Inc., in November 2019.

According to Bohler's January 2020 environmental impact statement/ compliance statement, Hartz's proposal met DEP's CZM Rules. Bohler explained that the project "falls under the jurisdiction of Waterfront Development because the [p]roject is located within the regulated waterfront area and within 500 feet of the mean high water line." As relevant to the issues on appeal, Bohler concluded the proposal complied with the CZM Special Area Rules in N.J.A.C. 7:7-9. Specifically,

Filled Water's Edge (N.J.A.C. 7:7-9.23)

The proposed residential development at Lincoln Harbor will comply with this policy. The "waterfront portion" of Lincoln Harbor adjacent to the site has been previously developed with a 30-foot-wide waterfront walkway[1] at the water's edge part of the Hudson Riverfront Walkway.

Flood Hazard Areas (N.J.A.C. 7:7-9.25)

The proposed project is located within the Flood Hazard Area for the Hudson River. A Flood Hazard Area permit application has been submitted as part of this permit package to address the Flood Hazard Area Control Act rules, N.J.A.C. 7:13.

Riparian Zone (N.J.A.C. 7:7-9.26)

According to the approved flood hazard area verification, the Hudson River has a 50-ft riparian

---

[1] This is an error. The walkway is only sixteen feet wide. Bohler corrected the error on the January 27, 2022 revised site plan submitted on remand.

zone measured from the mean high water line. The riparian zone is an actively disturbed area consisting of asphalt pavement, bulkhead and revetment stone. Asphalt pavement located within 25-ft of mean high water will be removed with this project and replaced with landscaping. The development is proposed over the area of existing asphalt pavement. No adverse impacts to any riparian zone will result.

Hudson River Waterfront Area (N.J.A.C. 7:7-9.46)

The project is located within the Hudson River Waterfront Area. The project complies with those conditions outlined in the policy. The Hudson Waterfront Walkway was previously constructed along the entire waterfront area of the property. Public access to the walkway is located through the northern section of the property adjacent to the existing waterfront park. In addition, a walkway adjacent to the eastern side of the building is being provided to allow public access to the Hudson Waterfront Walkway.

For the CZM Use Rules, N.J.A.C. 7:7-15, Bohler found:

High Rise Structure (N.J.A.C. 7:7-15.14)

This application contains a single structure supporting two (2) towers, 14-stories in height and while these structures are defined as high rise structures pursuant to these regulations, they are also deemed compatible with this policy in that they are part of a large high intensity development consisting of several buildings of varying heights, up to approximately 202 feet in height, which not only lends itself to the architectural character of the development but more importantly does not block any views of the River or skyline. In addition, as detailed on the plans,

14

the buildings are setback 50-ft from the mean high water and perpendicular to the Hudson River and separated from the River by the existing waterfront walkway. Therefore, Hartz's application is in compliance with these policies.

Finally, for the CZM Resource Rules, N.J.A.C. 7:7-16, Bohler found:

Public Access (N.J.A.C. 7:7-16.9)

The Lincoln Harbor development will continue to provide full access to the waterfront. The proposed development is adjacent to the Hudson Riverfront Walkway. In addition, there is perpendicular access from Harbor Boulevard to the waterfront via an accessway through the site. These areas are depicted on the Site Layout Plan contained in the Site Plan package. Parking for patrons of the walkway and waterfront parks will continue to be accommodated within the Lincoln Harbor development in specified areas conveniently located to these amenities.

Maris's traffic study described Lincoln Harbor as a mixed-use development located in Weehawken, near the Lincoln Tunnel, "bounded by the Hudson River to the east, a NJ Transit light rail line to the west, Port Imperial to the north and Weehawken Cove to the south." Acknowledging that "vehicular ingress and egress for Lincoln Harbor" is provided only by 19th Street, Baldwin Avenue, and Port Imperial Boulevard, although additional egress is provided by South Harbor Boulevard, a short road connecting Harbor Boulevard to southbound Park Avenue at 16th Street, the report states the

15

development "is served by several other modes of transportation that minimize the use of private vehicles" — including bus, light rail and ferry service to New York City.

The Maris study catalogued the other projects being developed in the vicinity of the property both within Lincoln Harbor and nearby at Port Imperial and in Hoboken, and assessed area traffic under three scenarios: (1) existing conditions; (2) conditions in two years if the other projects were constructed and occupied; and (3) conditions in two years if all projects, including Hartz's project, were constructed and occupied. It then assessed existing levels of traffic capacity, suggested various mechanisms to mitigate traffic problems, and addressed parking and property-specific turn-in and turn-out options. Maris concluded that Hartz's project

> will have sufficient parking and will generate a
> relatively small amount of traffic due to the
> availability of a variety of alternate travel modes
> within Lincoln Harbor. Although some intersections
> in the area experience delays due to the Project's
> proximity to the Lincoln Tunnel, the Project will not
> significantly increase the delays and the roadway/
> signal improvements identified herein will improve
> the traffic operating conditions.

Hartz served formal notice of its revised application to the Township, the County, Hoboken, and all property owners within 200 feet, including Rock

16

Eagle, and the Department deemed Hartz's revised application administratively complete.  Within a week, on January 31, 2020, Remington & Vernick, the Township's municipal engineers, submitted a memorandum to the Weehawken Planning Board and to DEP questioning Hartz's revised application and Maris's traffic study.  It recommended, among other things, that Hartz should revise and clarify its site plans, the impact of adjacent roadways and intersections, the parking-mix table, the stormwater management report, drainage area and runoff calculations, its proposed mitigation, and the stormwater collection system and outfalls.  The engineers also made specific recommendations to mitigate and offset the project's impact on traffic circulation, including on several local intersections, and on grading and drainage issues.

Over the next few months, DEP evaluated Hartz's application, requesting additional information from the developer, including revised compliance statements, new architectural plans "clearly identifying the high-rise and low-rise components," additional flood proofing measures, and a traffic study for the proposed project.  DEP had found that the project as proposed did not meet water quality standards, and that it was questionable as to its stormwater discharge, foundation construction, and spot elevations.  The Department noted that "spot elevations on the flood proofing plan . . . appear to show

17

portions of the building below the flood hazard area design flood elevation. If there are some areas proposed below the flood hazard area design flood elevation, . . . these areas must be flood proofed." DEP further found that Bohler's compliance statement as to N.J.A.C. 7:7-9.23 (filled water's edge) "referenced the adjacent site and not the subject site," and that Hartz needed to "clearly show" all proposed elevations of all enclosed spaces.

Bohler submitted responsive documents in April and May 2020, which included an updated waterproof detail sheet, a stormwater management report revised April 2020, a drainage and utilities plan dated April 2020, site plan documents revised May 2020, a revised roof plan diagram dated April 2020, and another copy of Maris's 2019 traffic study.

According to Bohler's revised stormwater management report, "the entire site lies within the Hudson River Floodplain at an elevation of NAVD88 12.00-feet," although "the elevation of the existing parking lot and roadway lies between 5.5- and 12-feet." Bohler also advised "the US Army Corps of Engineers is planning a floodwall to be constructed along the east side of the elevated section of Park Avenue on the site" in an easement provided for the purpose. Bohler advised Hartz's proposed project "will be on the river side of

18

the future floodwall," which "is intended to protect downtown Weehawken and the Northern part of Hoboken."

In May 2020, Thonet, on behalf of Rock Eagle, submitted its third set of detailed comments to the Department about deficiencies in Hartz's application even after its latest revisions. Thonet asserted, among other objections, that Hartz's recently submitted waterproof detail, was not signed or dated by a licensed architect or engineer, and that Hartz had failed to submit any signed and sealed architectural drawings, and no licensed architect or engineer had signed the application form's "Statement of Preparer of Plans, Specifications, Surveyor's or Engineer's Report." Thonet also complained of Hartz's failure to accurately describe the project site and clearly identify its lots on the proposed site plan drawings.

Thonet claimed that during the DEP's Flood Hazard Area Flood, that is, a flood having a 100-year recurrence interval, "the flood elevations in the Hudson River immediately adjacent to the site and as far inland as Harbor Boulevard . . . would reach elevation 16-feet NAVD88 with wave heights of four (4) to five (5) feet" making "the project and its 259 residential units . . . inaccessible during the duration of the flooding, with no personal, public, or emergency vehicles capable of entering or leaving the development." Thonet

19

asserted Hartz needed to better account for the property's "flood prone" nature and potential inaccessibility during floods, and that its stormwater management plan provided no calculations demonstrating the project's compliance with New Jersey's stormwater quality standards in N.J.A.C. 7:8-5.5. Thonet urged the Department to require Hartz to provide more information on the existing unused parking lot to support its assertion that stormwater quality treatment is not required for the proposed project (explaining how replacing the existing underused 138-car capacity asphalt parking lot with a project supporting "the comings and goings of 321 cars" will produce less stormwater contamination to the Hudson than the existing parking lot) and submit a traffic impact analysis documenting the impact of the proposed project on traffic flow and safety on Harbor Boulevard and on the quality of stormwater runoff.

Thonet also contended that "due to the relatively 'square' dimensions of the proposed towers," (229' x 200' according to Hartz's roof plan diagram) "it cannot be reasonably argued that the towers are oriented 'perpendicular' to the Hudson River," as Hartz asserts and N.J.A.C. 7:7-15.14(b)(3) requires. Thonet claimed "the proposed structure will block about 250-feet of the 350-foot view (about 70 percent) currently enjoyed by drivers and pedestrians along Harbor

Boulevard." Thonet noted Hartz had "provided no explanation of how the current design alternative 'minimizes' the obstruction of views from Harbor Boulevard" as required by N.J.A.C. 7:7-15.14(b)(4). It claimed it was instead clear that the two proposed "high rise towers on the site were specifically located and offset from each other to maximize the views of the Hudson River and the NYC skyline from the residential units themselves."

On May 19, 2020, DEP issued an Engineering Report and an Environmental Report summarizing its findings regarding the project's regulatory compliance with the applicable CZM Rules and Flood Hazard Area Control Act Rules, N.J.A.C. 7:13-1.1 to -24.11. It concluded that, although the project was in regulatory compliance, various conditions had to be added to the permit. Thus, DEP decided to "conditionally approve" Hartz's revised application.

Additionally, due to the pre-existing section of the Waterfront Walkway present on Hartz's property, DEP concluded the project complied with its rules concerning prime fishing areas, the public trust, public access, and scenic resources and design. It explained:

> [T]he proposed project is not likely to cause
> significant and adverse effects on water quality or
> supply, aquatic biota, flooding, drainage, channel
> stability, threatened or endangered species or their

21

current or documented historic habitats, navigation, energy production, or fishery resources.

The proposed project will not adversely impact adjacent properties not owned by the applicant. Hartz Mountain Industries owns the surrounding lots and Harbor Boulevard. The increase in impervious surfaces will increase the volume of stormwater discharged to the Harbor Boulevard stormwater system. Since this portion of Harbor Boulevard and the surrounding lots are owned by the applicant, this is acceptable. Additionally, . . . the flood hazard area is tidal and the stormwater is discharged directly to the Hudson shortly after being collected on Harbor Boulevard.

DEP further explained:

The proposed residential development is consistent with the surrounding Lincoln Harbor development as well as other high-rise uses in adjacent Hoboken. The project is located within a Metropolitan Planning Area as designated by the State Plan. The aesthetic design and usage of the proposed project coincide with the surrounding urban setting. As shown on the approved landscaping plan, landscaping buffers will be provided to separate the existing HRWW and the residential development. The applicant has demonstrated compliance with [the CZM Rules concerning Scenic Resources and design, N.J.A.C. 7:7-16.10, and Buffers and Compatibility of Uses, N.J.A.C. 7:7-16.11].

DEP also found that the project conditionally comported with flood hazard and stormwater regulatory requirements. For example, when considering the CZM Filled Water's Edge Rule, N.J.A.C. 7:7-9.23, DEP

22

referenced the 2010 permit previously requiring Hartz to construct a portion of the Waterfront Walkway on its property. Because the rule considers walkways to be a water dependent use in non-Coastal Area Facility Review Act, N.J.S.A. 13:19-1 to -21, areas, DEP determined that Hartz's construction under the 2010 permit would comply if Hartz had recorded a conservation restriction to permanently protect that section.

DEP also found that, because "the eastern and southeastern-most portions of the property are within a V-Zone with a 100-year flood elevation of 16 feet NAVD88," the project complied with the CZM Coastal High Hazard Area Rule, N.J.A.C. 7:7-9.18. It explained:

> The site is located within the tidal flood hazard area of the Hudson River. No work is proposed within the mapped floodway. There is no state flood mapping for the project site. On the effective FEMA FIRM, the site is entirely within Zone A with a 100-year flood elevation of 9 feet NAVD88. On the preliminary FEMA FIRM, the majority of the site is within a Coastal A Zone with a 100-year flood elevation of 12 feet NAVD88, although a small western portion of the property is outside of the Limit of Moderate Wave Action and is within Zone A with a 100-year flood elevation of 12 feet NAVD88. The eastern and southeastern-most portions of the property are within a V-Zone with a 100-year flood elevation of 16 feet NAVD88. Therefore, the regulatory flood hazard area elevation is 12 to 16 feet NAVD88.

DEP noted that "[t]he entire site is being raised so that the building can meet the elevation requirements," and that Hartz had proposed also raising "Harbor Boulevard approximately 3 to 4 feet so it will be at elevation 6 to 10 feet NAVD88.  While not one foot above the flood hazard area design flood, this is acceptable since to raise it even further would result in excessive fill and unfeasible slopes."

As to the CZM Riparian Zone Rule, N.J.A.C. 7:7-9.26, DEP relied on the October 2017 flood hazard area verification that established the riparian buffer for the property and an approved site plan that set a fifty-foot buffer from the mean high-water line of the Hudson River.  It explained:

> The subject site is located along the Hudson River.  This section of the Hudson River is classified as a non-trout, non-Category One, FW2-NT/SE2 watercourse with a 50-ft. riparian zone adjacent to it.  A[n] FHA Verification (LUR file no.: 0911-01-1001.10; FHA170001) was issued on October 31, 2017, identifying the 50-ft. riparian zone on the subject site.  Since the bank of the slope is heavily manipulated and the [Hudson River Waterfront Walkway] is located waterward of the river's bank, it was determined during the FHA Verification application review that the 50-ft. riparian zone will be measured from the [Mean High Water Line] and not at the top of the hard-armored bank.  The 50-ft. riparian zone is identified on the proposed site plan and it encompasses the hard-armored river bank and a section of the existing paved parking lot.  The applicant has proposed to construct a pedestrian

sidewalk and related amenities within the riparian zone. No impacts to riparian zone vegetation are proposed. According to N.J.A.C. 7:13-11.2(b)3, the removal of existing pavement within the 25-ft. [top of bank] is not required since "the regulated activity lies within an actively disturbed area adjacent to a lawfully existing bulkhead, retaining wall, or revetment along a tidal water or impounded fluvial water." The applicant has demonstrated compliance with this rule.

Notwithstanding those findings, DEP concluded that the "approved building must be dry flood-proofed" and waterproofed up to a depth of "at least one foot above the flood hazard area design flood elevation so that floodwaters cannot enter the structure during a flood."

As to the CZM High-Rise Structures Rule, N.J.A.C. 7:7-15.14, DEP found that the project's high-rise components, the two fourteen-story residential towers, were properly oriented perpendicular to the waterway. It explained:

> The applicant has proposed to construct two 14-story high-rise residential towers and a 6-story parking garage at the subject site. Based on a review of the roof top plan submitted, the total length of the combined high-rise structures, from west to east, will be 248 ft. in length and the combined high-rise structures, from north to south, will be 228 ft. in length. The longest lateral length of 248 ft. of the combined high-rise structures are oriented perpendicular to the main stem of the Hudson River. Additionally, the high-rise component of the building is set back 50-ft. from the [Mean High Water Line] of

25

the Hudson River. The high-rise structures proposed are consistent with the height of the surrounding development located within Lincoln Harbor. The applicant has demonstrated compliance with this rule.

In other words, because the tallest components were set back fifty feet from the Hudson River's mean high water line, although the ground level components were not, DEP found the project met the rule.

DEP next considered Hartz's traffic study by Maris under both the CZM Traffic Rule, N.J.A.C. 7:7-16.12, and Secondary Impacts Rule, N.J.A.C. 7:7-14.3. DEP found that, although the project would increase traffic, Remington & Vernick had recommended several traffic circulation and mitigation measures to ensure minimal adverse effect. Thus, DEP decided to include a permit condition requiring Hartz to comply with those mitigation requirements.

On May 21, 2020, DEP approved the permit application, allowing Hartz to construct "a residential development consisting of 259 residential units in two (2), 14-story high-rise towers, a 6-story parking garage, pedestrian sidewalks, hardscaping and landscaping amenities, and improvements to Harbor Boulevard, in association with Lincoln Harbor Development on the parcels." Because the conservation restriction from the 2010 permit was never recorded, DEP added a pre-construction condition requiring Hartz to "file a

conservation restriction for the authorized 30-foot easement and Hudson River

Waterfront Walkway with related walkway amenities."

In addition, Special Condition Four of the permit included the following

requirements:

> The approved building must be dry flood-proofed to meet the requirements at N.J.A.C. 7:13-12.5(s) and shall be designed and constructed to be waterproof up to a depth of at least one foot above the flood hazard area design flood elevation so that floodwaters cannot enter the structure during a flood. Specifically, the building's foundation, floor slab and walls shall be designed to resist hydrostatic pressure up to the flood hazard area design flood elevation. In addition, any exterior wall opening below the flood hazard area design flood elevation, such as a door or window, shall be equipped with waterproof seals and/or panels and shall also be designed to resist hydrostatic pressure up to the flood hazard area design flood elevation.

And Special Condition Six required Hartz to "adhere to, and implement, the

traffic mitigation measures" referenced in Remington & Vernick's

memorandum dated January 31, 2020.

On remand, Hartz submitted additional information to DEP, which

included: (1) a revised site plan prepared by Bohler, dated January 27, 2022,

with new street and aerial drone and envisioned photos; and (2) a new "19th

27

Street Corridor Study" prepared by Remington & Vernick, dated December 2, 2021.

For the revised site plan, Bohler identified and added a thirty-foot-wide waterfront easement with a sixteen-foot-wide walkway along the eastern and southern boundaries of the site for clarification purposes. Essentially, Bohler simply redrew the easement boundary line, eliminating any encroachment that DEP had discovered from Rock Eagle's merits brief. Bohler provided no explanation for the relocation of the boundary line or why its revised signed site plan was more accurate than its original signed site plan.

For the Corridor Study, the Board had asked Remington & Vernick to work with Maris, Hartz's traffic consultant, to: (1) evaluate the existing and proposed traffic conditions at five intersections and one traffic corridor near the project; (2) identify specific improvements that could be implemented to help mitigate impacts from the project on the traffic corridor; and (3) improve overall service and delay at those intersections. Accordingly, Remington & Vernick and Maris conducted joint field reconnaissance and collaborated in refining and analyzing the traffic model that Hartz had originally submitted to the Board. Based on their findings, Remington & Vernick concluded that certain improvements were "warranted and necessary" at the intersection of

A-4009-19

19th Street and Waterfront Terrace because of the proposed project and other

area Lincoln Harbor development, and "should be instituted prior to the

issuance of any certificates of occupancy for the development."  Those

improvements included optimizing traffic signal length and splits and

submitting a second phase plan of improvements that provided for upgraded

signal display, traffic striping, pavement markings, and traffic signal timing

changes for a new traffic pattern.

On March 10, 2022, DEP issued its "Waterfront Development Remand

Report" wherein it reevaluated traffic impacts, viewshed impacts, public

access and the project's impact on the Hudson River waterfront.

Pursuant to the CZM Traffic Rule, N.J.A.C. 7:7-16.12, DEP found that

the new Corridor Study

> was based on an analysis of existing conditions at
> future traffic volumes at specific locations;
> comparison of traffic volumes in 2019 and 2020;
> traffic projections for the Design Year 2025; the
> Synchro Model of peak AM and PM highways hours
> in 2019 and projected 2025; the Synchro Analyses of
> existing traffic conditions; potential roadway and
> signal improvements; and an analyses of [Maris's]
> Synchro Analyses.  According to the report, the 2025
> traffic volumes included the 2019 volumes increased
> by an annual traffic growth rate published by the New
> Jersey Department of Transportation (NJDOT).

The [Corridor Study] report concluded that improvements at two (2) specific locations (19th Street and Waterfront Terrace) are necessary to maintain below level of service D.[2]

Thus, DEP declared that these "improvements" would be included as new conditions in "the WFD modification permit" after remand.  DEP stated: "[t]hese conditions, in addition to the pre-existing conditions which will continue in the WFD modification permit, that the applicant must work with

---

[2]  According to NJDOT's Roadway Design Manual, p. 2-7 (2015, including baseline document change announcements to July 17, 2023, https://nj-dot.nj.gov/transportation/eng/documents/RDM/):

> The level of service concept places various traffic flow conditions into 6 levels of service.  These levels of service, designated A through F, from best to worst, cover the entire range of traffic operations that may occur.
>
> . . . .
>
> Level of Service D approaches unstable flow, with tolerable operating speeds being maintained though considerably affected by changes in operating conditions.  Fluctuations in volume and temporary restrictions to flow may cause substantial drops in operating speeds.  Drivers have little freedom to maneuver, and comfort and convenience are low, but conditions can be tolerated for short periods of time.

See https://nj-dot.nj.gov/transportation/eng/documents/RDM/documents/2015RoadwayDesignManual_20231226.pdf (last visited Dec. 3, 2024).

and address all municipal traffic conditions and requirements, will ensure compliance with the Traffic Rule."

Pursuant to the CZM High-Rise Structures Rule, N.J.A.C. 7:7-15.14, DEP first found that, because Hartz had proposed the construction of two, fourteen-story residential towers and a six-story parking garage, the project contained both low-rise (one to five stories) and high-rise (six to sixteen stories) structures. Thereafter, for the following reasons, DEP determined that the project was "consistent" with the rule's subsections and no additional conditions were required.[3]

First, DEP explained that the project complied with N.J.A.C. 7:7-15.14(b)(1) because "the proposed high-rise structures will be located in an urban area of existing high-rise and high density settlements."

Second, the project complied with N.J.A.C. 7:7-15.14(b)(2) because "the proposed high-rise structures are separated from coastal waters by a 50 ft. setback as shown on the roof top plan submitted during the original application."

---

[3] N.J.A.C. 7:7-15.14(b)(5) does not apply. It states: "High-rise structures outside of the Hudson River waterfront special area as defined by N.J.A.C. 7:7-9.46 shall not overshadow the dry sand beach between 10:00 A.M. and 4:00 P.M. between June 1 and September 20, and shall not overshadow waterfront parks year round[.]" N.J.A.C. 7:7-15.14(b)(5).

Third, the project complied with N.J.A.C. 7:7-15.14(b)(3) because,

> based on a review of the roof top plan submitted during the original application, . . . the total length of the combined high-rise structures, from west to east, will be 248 ft. in length and the combined high-rise structures, from north to south, will be 228 ft. in length. The longest lateral length of 248 ft. of the combined high-rise structures is oriented perpendicular to the main stem of the Hudson River.

Fourth, the project complied with N.J.A.C. 7:7-15.14(b)(4) because "the proposed high-rise structures do not block the views currently enjoyed from existing residential structures, public roads or pathways to the maximum extent practicable." DEP explained:

> On January 25, 2022, the permittee submitted viewshed drone photos taken from near-by residential buildings and public roads surrounding the project site. The rendered photos show the view from each specific building studied looking towards the Hudson River. Viewshed photos from the following locations were provided: Zerman Place, Troy Tower pool deck, Troy Tower 11th floor, 19th Street and 18th Street, 18th Street, 18th and Lawrence Place, Chestnut Street and 19th and Willow Street. Drone viewshed photos were also provided from approximately the 8th floor of The Gateway. The Gateway property is a 10-story residential building located at 1700 Park Avenue [Rock Eagle's building], immediately landward and northwest of the subject site.

Based on its review of those photos, DEP determined that

32

while some views of the Hudson River and the New York City skyline are blocked due to the proposed structures, a majority of the river and skyline's view is still available along Harbor Boulevard. There's currently an existing 16-ft. wide waterfront walkway along the eastern and southern property boundaries of the subject site. The view of the Hudson River and the New York City skyline can be viewed from the entire length of the waterfront walkway at this location. The Department recognizes that views that are blocked from the proposed structures are also currently blocked by existing buildings of similar height. The high-rise structures proposed are consistent with the height of the surrounding development.

Fifth, DEP determined that the project complied with N.J.A.C. 7:7-15.14(b)(6) because "the proposed high-rise structures are in character with the surrounding transitional heights and residential densities." DEP explained:

The Township of Weehawken is known for its high-rise structures, which provides for views of the Manhattan skyline. The proposed project is consistent with the overall Lincoln Harbor (Atir) development area, where buildings range from 4 stories to 10 stories high. Such residential and commercial buildings include Hamilton Cove and the Sheraton Lincoln Harbor hotel.

Sixth, DEP determined that the project complied with N.J.A.C. 7:7-15.14(b)(7) because "the proposed high-rise structures do not have an adverse impact on air quality, traffic, and existing infrastructure." DEP explained that, in addition to its finding that the project had "no adverse impacts to traffic,"

33

"there will be no adverse impact to air quality or existing infrastructure because there is no significant impact to traffic."

And seventh, DEP determined that the project complied with N.J.A.C. 7:7-15.14(b)(8) because "the proposed high-rise structures are architecturally designed so as to not cause deflation of the beach and dune system or other coastal environment waterward of the structure."  DEP explained:  "As shown on the approved site plans, no activities are authorized waterward.  The proposed high-rise structures will not cast shadows on any beaches or waterward parks within the vicinity of the project area and will have no impact to the Hudson River."

Pursuant to the CZM Public Access Rule, N.J.A.C. 7:7-16.9(a), (k)(2)(iv)(1), and (r), and the Hudson River Waterfront Area Rule, N.J.A.C. 7:7-9.46, DEP noted that, since it had granted the 2010 permit, Hartz had constructed the sixteen-foot-wide Waterfront Walkway on pilings on Lot 2.03, and the walkway was accessible to the public.  Hartz, however, had not yet recorded the required public access walkway conservation easement that was included as a condition in the 2010 permit.  Thus, DEP determined that it would modify the 2020 permit by including a new condition requiring Hartz "to record a conservation restriction for the 30-ft. public access easement on

34

the revised plan submitted." In addition, DEP declared that it would allow "amenities such as planter boxes, benches, and seating areas" to be placed within the easement area because such structures "provide[d] a public benefit" and were "encouraged" within a public access easement.

In conclusion, based on its review of "the high-rise viewshed analyses, a final traffic report, and a revised site plan," DEP determined in its Remand Report that the supplemental information submitted by Hartz on remand demonstrated the project's "compliance with the [CZM] traffic rule at N.J.A.C. 7:7-16.12, high-rise structures rule at N.J.A.C. 7:7-15.14. and the public access rule at N.J.A.C. 7:7-16.9." Nevertheless, DEP required Hartz to "submit" an application for "an Administrative WFD Upland IP modification" pursuant to N.J.A.C. 7:7-27.6 and 27.7, in order "to incorporate [the] additional conditions gathered from [the] supplemental information," that is, relating to traffic and the creation of a conservation easement.

In an email to DEP on March 14, 2022, Rock Eagle's counsel requested copies of all communications exchanged between DEP and Hartz since August 20, 2021, and all documents received and/or relied upon by DEP in reaching its conclusions in the Remand Report. DEP provided the information to counsel on March 15, 2022. Previously, Rock Eagle's counsel had been copied

on emails between DEP and Hartz during the remand in November 2021, December 2021, January 2022, and February 2022, with attached copies of a site plan revised in May 2020, a subdivision plat, a shadow study, several new photos depicting the proposed construction from various views, and Remington & Vernick's Corridor Study.

Within a week, Rock Eagle filed the supplemental brief we'd permitted in our remand order, arguing that, although our order had permitted DEP to address "the encroachment questions and other issues identified in the DEP's remand motion," the only issue identified was the encroachment. Thus, the Department had violated our order by accepting and reviewing new documents from Hartz prepared during the remand that went beyond encroachment issues, specifically those documents supporting the project's compliance with the CZM High-Rise Structures and Traffic Rules. In addition, Rock Eagle claims DEP erred by failing to afford it and other interested parties the opportunity to submit their own comments and data challenging the new documents. In related arguments, it claims the Department's decision on the encroachment issue was procedurally improper and based on unverified, unreliable information, and that the new photos on which the Department relied do not support its finding regarding the High-Rise Structure Rule, N.J.A.C. 7:7-15.14.

A-4009-19

In sum, Rock Eagle argues DEP's Remand Report, to the extent it addresses any issues other than encroachment of the fifty-foot setback line, must be disregarded and its determinations reversed because they were arbitrary, capricious and unreasonable.[4]

Hartz argues that Rock Eagle is a third-party objector and, thus, has no standing to bring an administrative challenge against DEP's issuance of any permit. We reject the argument as without merit. See In re Waterfront Dev. Permit No. WD88-0443-1, Lincoln Harbor Final Dev., Weehawken, Hudson Cnty., 244 N.J. Super. 426, 429, 437 (App. Div. 1990) (holding non-profit environmental group had standing to challenge permit claiming proposed project would obscure the scenic vista, "described as 'spectacular,'" of the New York skyline from the Lincoln Tunnel Helix "now enjoyed by hundreds of

---

[4] Rock Eagle also moved to strike DEP's Remand Report or, in the alternative, to supplement the record, arguing DEP: (1) went beyond the scope of the court's remand order by accepting a new site plan and other supporting documents from Hartz that moved the easement line and provided more information on traffic and high-rise structure issues; and (2) never provided Rock Eagle or the public with notice of its intention to accept those documents or with the opportunity to submit comments or opposition documents. Rock Eagle requested an additional ninety days to allow it time to review the new documents and to supplement the record with the comments it would have submitted. We denied the motion to strike but reserved the motion to supplement "for the merits panel to assess in its plenary review." We now deny the motion to supplement the record.

thousands of bus and car passengers each day. Although portions of the view will remain intact if the project proceeds as planned, it appears that its panoramic beauty will be substantially lost — except to the commercial tenants of the two towers."). It also claims the documents submitted during remand were prepared by licensed professional engineers and, therefore, contained reliable and verifiable information fully addressing DEP's concerns.

DEP argues the findings in its Remand Report were well within the scope of the court's remand order, which instructed it to address encroachment questions and other issues it had identified in its remand motion. DEP further claims it provided Rock Eagle with appropriate and timely notice of its remand process and the additional documents it had received from Hartz. DEP claims Rock Eagle had submitted comments outside any official comment period before and intentionally chose not to do so during the remand process.

When an appellate court directs an administrative agency to take action, "the appellate judgment becomes the law of the case and the agency is under a peremptory duty not to depart from it." Lowenstein v. Newark Bd. of Educ., 35 N.J. 94, 116-17 (1961). "An agency's powers on remand depend upon the contents of the court's remand order, which the agency must obey precisely." Trantino v. N.J. State Parole Bd., 331 N.J. Super. 577, 606 (App. Div. 2000),

aff'd as modified on other grounds, 166 N.J. 113, modified, 167 N.J. 619 (2001).  Whether or not in agreement with the court, agencies have "a duty to obey the mandate of [the Appellate Division] 'precisely as it is written.'"  In re Denial of Reg'l Contribution Agreement Between Galloway Twp. & City of Bridgeton, 418 N.J. Super. 94, 100-01 (App. Div. 2011) (quoting Flanigan v. McFeely, 20 N.J. 414, 420 (1956)).  Even when an appellate court's decision is "manifestly erroneous," those instructions "must be enforced as written, and relief from its direction 'can be had only in the appellate court whose judgment it is.'"  Tomaino v. Burman, 364 N.J. Super. 224, 233 (App. Div. 2003) (quoting In re Plainfield-Union Water Co., 14 N.J. 296, 303 (1954)).

We reject Rock Eagle's argument that the Department exceeded the scope of our remand order.  In its motion brief, the Department stated it sought the remand to further develop the record, i.e., accept additional materials, and then reconsider "the application in light of the Hudson River Waterfront standards, including the arguments raised by [Rock Eagle]" in its merits brief.

The Hudson River Waterfront standards are found in N.J.A.C. 7:7-9.46. The rationale behind that regulation provides:

> The Hudson River waterfront area has historically been, and is currently, heavily populated and extensively developed.  Development pressures are intense in this area.  Given its preexisting density of

development, this rule seeks to encourage further development if constructed to ensure the safety of people and property in order to steer development towards actively disturbed areas and away from undisturbed areas of the coast. Further, this rule serves to encourage redevelopment efforts in several cities in the Hudson River waterfront area to increase the economic and social vitality of these areas while making wise use of existing footprints of development and infrastructure. Building height requirements are different for buildings in this special area than for other areas of the coast in order to facilitate this redevelopment and are balanced by requiring public open space and visual access to the water through other means.

The public access requirements for development in the Hudson River waterfront area are intended to balance the public trust rights of people to access the water with site-specific safety needs. The rule facilitates the completion of the Hudson River Waterfront Walkway, which is intended to provide contiguous access to the waterfront for the public in accordance with the Public Trust Doctrine. . . .

[N.J.A.C. 7:7-9.46(g).]

Given those standards and the issues Rock Eagle raised in its merits brief, we cannot find DEP expanded the scope of our remand order by reevaluating the project's impact on traffic, viewshed, public access and its effect on the Hudson River.

There is no question, however, but that the Department departed from the mandate to address those issues "on appropriate notice to appellant Rock

40

Eagle and any other interested parties."  Although we do not find the Department exceeded the scope of our remand order, there is no disputing that the encroachment issue was the only one the Department mentioned specifically in its motion.  Copying Rock Eagle's counsel on some, but not all, emails the Department sent to Hartz and making sure Hartz copied Rock Eagle's counsel on documents Hartz submitted to the Department without advising Rock Eagle of the issues the Department had apparently advised Hartz, in telephone conferences and at least one meeting, it would review, failed to provide Rock Eagle the "appropriate notice" of the issues as required by our order.

Moreover, the Department simply ignored the well over one hundred identified interested parties who had already complained to it, chiefly about the project's potential to block their scenic views and its impact on the traffic in what is clearly an already congested area and neighborhood.  The Department contends it provided those interested parties "constructive notice" by its publication of the remand report and the provision of a 30-day public comment period that commenced on publication of the notice in the March 17, 2022, NJDEP Bulletin.  Even were we inclined to agree that "constructive

41

notice" was "appropriate notice," which we do not, the 128-day remand period had already ended by that time and jurisdiction returned to this court.

Although the better practice would have been for the Department to have required Hartz to have re-noticed the local and municipal parties and all property owners within 200 feet, the remand order made it incumbent on the Department to have at least required actual notice to those interested parties who had commented on Hartz's initial application. Cf. In re State & Sch. Emps.' Health Benefits Comm'ns' Implementation of Yucht, 233 N.J. 267, 282 (2018) (noting that while "an agency's choice of action for providing notice does not require adoption of a perfect practice . . . , the means of notice in fulfillment of . . . statutory policy . . . must be designed to reasonably achieve its intended purpose"). There was certainly sufficient time allotted to have provided actual notice to those parties and to have allowed them to comment on Hartz's new and revised submissions. If DEP harbored any concern on that point, the solution was to have applied to this court, not to deny identified interested parties actual notice.

Further, the CZM Rules require DEP to "[e]nsure opportunities for public participation in coastal decision-making." N.J.A.C. 7:7-1.1(c)(7)(iv). N.J.A.C. 7:7-24.3 requires waterfront development permit applicants to notify

all property and easement owners within 200 feet of the development together

with local and county officials.[5]  And, under N.J.S.A. 52:14B-3.1(a) of the

---

[5]  In its Remand Report, DEP required Hartz to "submit" an application for "an Administrative WFD Upland IP modification" pursuant to N.J.A.C. 7:7-27.6 and 27.7, in order "to incorporate [the] additional conditions gathered from [the] supplemental information."  Under N.J.A.C. 7:7-27.5(a), an individual permit "may be modified . . . through an administrative modification," which applies to a change to a site plan or other document on which the original authorization under a[n] . . . individual permit was based but which does not alter the design or layout of the project.  An administrative modification may include:

> 1.  Correcting a drafting or typographical error on a plan or report;
>
> 2.  Improving topographical or other data in order to make the authorization or individual permit more accurately reflect the site and/or the permitted activities; or
>
> 3.  Adding notes, labels, or other clarifying information to the approved site plan, if required to do so by the Department or another government entity.
>
> [N.J.A.C. 7:7-27.5(c).]

N.J.A.C. 7:7-27.5(e) provides that a major technical modification under an individual permit applies

> to any change in a project authorized pursuant to the authorization or individual permit, including any associated change to an approved site plan or other document, which is not addressed under (c) or (d)

Administrative Procedure Act, "all interested persons are afforded reasonable opportunity to submit data, views or arguments, orally or in writing, during any proceedings involving a permit decision" (emphasis added). Such presentations and submissions "provide an effective and efficient means for third-party objectors to voice their concerns with the State officials who will make the ultimate permitting decision." In re Riverview Dev., LLC, 411 N.J. Super. 409, 425 (App. Div. 2010). Indeed, whether a third-party objector's due process rights may be satisfied by an agency's review process depends in significant part on the objector's ability to participate in the process. See In re Freshwater Wetlands Statewide Gen. Permits, 185 N.J. 452, 471-74 (2006).

------

[minor technical modifications] above and that does not require a new permit in accordance with (f) below.

Under N.J.A.C. 7:7-27.5(f)(7), DEP cannot issue a modification and the permittee must submit a new application when "[a] change . . . would result in impacts to a site not owned or controlled by the permittee."

DEP has characterized the traffic-related permit modifications as "administrative in nature as they constitute improvements to other data that make the permit more accurately reflect the permitted activities." See N.J.A.C. 7:7-27.5(c)(2). Rock Eagle contends the Department "has essentially issued a major technical modification to the permit," without public notice, contravening both its own regulations and its jurisdiction on remand. We express no opinion as to whether the permit modifications adding traffic controls qualify as "administrative in nature" or whether they constitute a change resulting "in impacts to a site not owned or controlled by the permittee," requiring a new application. See N.J.A.C. 7:7-27.5(f)(7).

It has long been settled law in this State that "government must 'turn square corners' rather than exploit litigational or bargaining advantages." W.V. Pangborne & Co. v. N.J. Dep't of Transp., 116 N.J. 543, 561 (1989). Because we conclude the Department violated our remand order by failing to provide "appropriate notice to appellant Rock Eagle and any other interested parties" that it had determined to accept additional materials from Hartz in support of the permit, specifically new aerial drone photos with superimposed renderings of the project taken from nearby residential buildings and roads and a new traffic study and then reevaluate the project's impact on viewshed, public access and traffic — and that interested persons were also entitled to submit data in opposition to the permit and have the Department consider their views — see In re Issuance of Access Conforming Lot Permit No. A-17-N-N040-2007, 417 N.J. Super. 115, 131 (App. Div. 2010) (explaining "an expansive view should be taken of the obligation of State agencies to consider information submitted by parties opposed to the grant of a governmental approval"), we reverse the decision on remand and vacate the waterfront development permit issued to Hartz.

We have considered whether a remand instead of reversal is the correct course and have decided another remand would be inappropriate at this

45

juncture. It is difficult, if not impossible, to review this record without concluding DEP, to which we ascribe no bad faith or ill motive, accepted additional, important information on remand — without any public notice — to shore up its initial decision that Hartz had complied with N.J.A.C. 7:7-15.14(b)(4), which would otherwise lack adequate support in the record. See CBS Outdoor, Inc. v. Borough of Lebanon Plan. Bd./Bd. of Adjustment, 414 N.J. Super. 563, 586-87 (App. Div. 2010) ("One of the hallmarks of the 'turn square corners' doctrine is that its application is not dependent upon a finding of bad faith."). Simply stated, by failing to give interested parties notice that it was accepting additional submissions from Hartz on traffic and viewsheds, after which it would reconsider the permit under the Waterfront Development standards, and that those persons were also entitled to make their views known and to have them considered by the Department in rendering its decision on the permit, DEP failed to "turn square corners" in its dealings with the public in its conduct of our last remand.[6] See Pangborne, 116 N.J. at 561.

---

[6] We recognize that the traffic issues were the subject of hearings before the Weehawken Planning Board, which affects our consideration of "the administrative process provided in this matter." See Freshwater Wetlands, 185 N.J. at 472 ("In determining whether the objectors received due process, it is appropriate to consider the interplay between the DEP and Planning Board hearings.").

46

The CZM High-Rise Structures Rule, N.J.A.C. 7:7-15.14, applies only "to structures which are more than six stories or more than 60 feet in height as measured from existing preconstruction ground level." N.J.A.C. 7:7-15.14(a). The rule does not ban these structures, but provides standards for development, including for orientation and setbacks. N.J.A.C. 7:7-15.14(b) states:

> 1. High-rise structures are encouraged to locate in an urban area of existing high density, high-rise and/or intense settlements;
>
> 2. High-rise structures within the view of coastal waters shall be separated from coastal waters by at least one public road or an equivalent area (at least 50 feet) physically and visually open to the public except as provided by N.J.A.C. 7:7-9.46;
>
> 3. Where the high-rise structure is a building or complex of buildings that comprises both a low-rise component(s) that is six stories or 60 feet or less in height as measured from preconstruction ground level and a component(s) that is more than six stories or more than 60 feet in height as measured from existing preconstruction ground level, the longest lateral dimension of each component that is more than six stories or more than 60 feet in height as measured from existing preconstruction ground level must be oriented perpendicular to the beach or coastal waters . . . ;
>
> 4. To the maximum extent practicable, the proposed structure must not block the view of dunes, beaches, horizons, skylines, rivers, inlets, bays, or oceans that are currently enjoyed from existing residential structures, public roads, or pathways;

A-4009-19

. . . .

6. The proposed structure must be in character with the surrounding transitional heights and residential densities, or be in character with a municipal comprehensive development scheme requiring an increase in height and density which is consistent with all applicable sections of this chapter;

7. The proposed structure must not have an adverse impact on air quality, traffic, and existing infrastructure; and

8. The proposed structure must be architecturally designed so as to not cause deflation of the beach and dune system or other coastal environmental waterward of the structure.

DEP's rationale behind the rule provides:

Considerable recent residential development along the coast, from the Palisades to the barrier islands, has taken the form the high-rise, high-density towers. While conserving land, some high-rise structures represent a visual intrusion, cause adverse traffic impacts, and cast shadows on beaches and parks. This rule seeks not to ban high rise structures, but to provide criteria for their development at suitable locations and in appropriate orientation with regard to the coastline in the coastal zone.

[N.J.A.C. 7:7-15.14(d).]

Rock Eagle argues that even though the project meets the requirement of

N.J.A.C. 7:17-15.14(b)(3) in that the project's longest lateral dimension, from

west to east of 248 feet (exceeding its north to south lateral line by twenty feet) is perpendicular to the River, DEP was still required to find the two proposed high-rise towers were designed in accordance with N.J.A.C. 7:17-15.14(b)(4), so as "to not block," "[t]o the maximum extent practicable," the existing views of the New York skyline and the Hudson River "currently enjoyed from existing residential structures, public roads, or pathways."

Rock Eagle maintains Hartz's proposed offset arrangement of the towers blocks 250 feet of the 350-foot-wide view, nearly 70 percent of the skyline, and that there was sufficient land available to have allowed Hartz to have located one tower behind the other or eliminate one tower in favor of lengthening the other perpendicular to the River in accordance with renderings it has provided on appeal, greatly reducing the towers' impact on the views from neighboring streets and residential properties.

DEP argues the "maximum extent practicable" standard is different from the alternatives analysis found in other environmental regulations, such as N.J.A.C. 7:7-9.6(b) (alternatives analysis required before developing in submerged vegetation habitat); N.J.A.C. 7:7-9.44(e) (alternatives analysis required for linear development in wild and scenic river corridors); N.J.A.C. 7:7-9.47(k) (alternatives for Atlantic City intercept parking); N.J.A.C. 7:7A-

49

10.2 and -16.9 (requiring alternatives analysis for freshwater wetlands individual permit); N.J.A.C. 7:8-5.2(e) (alternatives analysis required for stormwater waiver for certain developments). Unlike those cited rules, according to DEP, the high-rise structures rule does not use the word "alternatives" nor does it require the applicant to prepare an analysis demonstrating alternate development configurations. DEP also asserts that Rock Eagle could have submitted the design renditions in its merits brief during the public comment period.

As DEP correctly claims, there is no definition for "maximum extent practicable." In fact, when DEP was promulgating the stormwater management rules in 2004, see 36 N.J.R. 670(a) and 781(a) (Feb. 2, 2004) (adopting N.J.A.C. 7:8), commenters requested "a definition" of "maximum extent practicable," 36 N.J.R. at 691 (comments 185-86), but DEP declared the term is "fact-sensitive and cannot be reduced to a standard formula. The reviewing agency's administrative discretion in determining compliance with these rules will be guided by the goals of this chapter and its statutory mandates." 36 N.J.R. at 691 (DEP's response to comments 185-86). DEP explained that the term was "used to describe the expenditure of effort required to achieve full compliance with the applicable standard, taking into account the

A-4009-19

specific circumstances of the development in question."  36 N.J.R. at 691

(DEP's response to comments 185-86).

In Delaware Riverkeeper Network v. New Jersey Department of

Environmental Protection, 463 N.J. Super. 96, 125 (App. Div. 2020), the court

noted that "[t]he 'MEP' [(maximum extent practicable)] standard has not been

precisely defined" for evaluating New Jersey Pollutant Discharge Elimination

System (NJPDES) general permits.  The federal Environmental Protection

Agency told the court "that this phrase was intentionally left undefined 'to

allow maximum flexibility in . . . permitting'" and "should be applied in a site-

specific, flexible manner."  Ibid.

In Riverview Development, 411 N.J. Super. at 411, the court was faced

with a challenge to a proposed high-rise development by local residents

asserting that the project would block their views of the Hudson River and

New York City skyline.  The appellants were seeking a formal administrative

hearing, which the court rejected but found the CZM High-Rise Structures

Rule "undoubtedly embrace[d] a goal of protecting scenic views of the

waterfront," and that goal of protection was qualified by the phrase "to the

maximum extent practicable." Id. at 435.  The court explained that the

"qualification reflects a balanced regulatory sensitivity to the physical,

economic, and other pragmatic constraints that affect waterfront construction." Ibid.

The court in Riverview Development also noted that DEP had asked the applicant to provide a "view shed analysis [that] would depict anticipated views of the proposed project from various nearby locations." Id. at 414. It explained, quoting N.J.A.C. 7:7-4.2(a)(5), that "[a] view shed analysis consists of a group of '[p]hotographs showing the specific location of the proposed development taken from a minimum of four different locations and labeled as to orientation.'" Id. at 414 n.2. The requirement of submitting "[p]hotographs showing the specific location of the proposed development taken from a minimum of four different locations and labeled as to orientation" was added to the application process for coastal zone permits effective October 1995, 27 N.J.R. 3976(a) (Oct. 15, 1995), but it was recodified and rewritten out in 2015, 47 N.J.R. 1392(a) (July 6, 2015), and in 2018, 50 N.J.R. 361(a) (Jan. 16, 2018) (see N.J.A.C. 7:7-23.2, general application requirements). Hartz filed its application with DEP in 2019 and its revised application in 2020.

Although we agree with the Department that the "maximum extent practicable" review standard in N.J.A.C. 7:7-15.14(b)(4) does not require DEP to demand a formal alternatives analysis from a permit applicant as to whether

and to what extent the orientation of the proposed development blocks the neighbors' scenic views, see In re Appeal by Progressive Cas. Ins. Co., 307 N.J. Super. 93, 102 (App. Div. 1997), we view the Department's defense as something of a straw man argument as Rock Eagle has not contended a formal alternatives analysis is required.[7]

Rock Eagle's argument is that DEP never considered the project's compliance with N.J.A.C. 7:7-15.14(b)(4) in its 2020 Environmental Report, a fact confirmed by the record. Hartz's January 2020 environmental impact statement/compliance statement declared the project "importantly does not block any views of the River or skyline." And views are not mentioned at all in the Department's analysis of Hartz's compliance with the high-rise structures rule, N.J.A.C. 7:7-15.14, in the 2020 waterfront development individual permit environmental report.

Instead, as DEP explains in its brief: "Pursuant to DEP's long-standing rule interpretation," it "[i]n essence, . . . interprets (b)(3) to work in conjunction with (b)(4)." Thus, the Department concludes, "if a proposed

---

[7] See Kaye v. Rosefielde, 432 N.J. Super. 421, 478, n.30 (App. Div. 2013) (explaining "the technique of setting up an argument that does not exist and then refuting that misrepresented argument is called the 'straw man' fallacy") (quoting Canesi ex rel. Canesi v. Wilson, 158 N.J. 490, 518 (1999) (O'Hern, J., concurring)), rev'd on other grounds, 223 N.J. 218, 238 (2015).

development meets the perpendicular orientation requirement imposed by N.J.A.C. 7:7-15.14(b)(3), DEP finds it has addressed the impacts to view sheds from existing structures to the maximum extent practicable pursuant to N.J.A.C. 7:7- 15.14 (b)(4)."  DEP asserts in its brief that because "the tallest components were oriented perpendicular to the waterway, were consistent with the height of surrounding buildings, and the pre-existing Walkway provided ongoing views, the Project also did not block existing views to the maximum extent practicable."

Of course, "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that the action was based, not an after-the-fact [statement] purporting to explain the administrative agency's decision."  In re Petition of Elizabethtown Water Co., 107 N.J. 440, 460 (1987) (quoting Sec. & Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 87 (1943)). "An appellate brief is no place for an agency to try and rehabilitate its actions." In re N.J.A.C. 7:1B-1.1 et seq., 431 N.J. Super. 100, 139 (App. Div. 2013).

As we understand the Department's explanation for the absence of any discussion of the project's impacts on neighboring views in the 2020 permit decision, the Department concluded that because the project met the requirements in N.J.A.C. 7:7-15.14(b)(3), it necessarily also met the

requirements of N.J.A.C. 7:7-15.14(b)(4). Thus, it simply, and improperly, read (b)(4) out of existence, failing to require Hartz to demonstrate in 2020 that "[t]o the maximum extent practicable," its "proposed structure" did not "block the view" of the Hudson River or New York skyline "that are currently enjoyed from existing residential structures, public roads, or pathways." See DKM Residential Props. Corp. v. Twp. of Montgomery, 182 N.J. 296, 307 (2005) ("When interpreting a statute or regulation, we endeavor to give meaning to all words and to avoid an interpretation that reduces specific language to mere surplusage.").

We "extend substantial deference to an agency's interpretation of its own regulations, reasoning that 'the agency that drafted and promulgated the rule should know the meaning of that rule.'" In re Orban, 461 N.J. Super. 57, 72 (App. Div. 2019) (quoting In re Freshwater Wetlands Gen. Permit No. 16, 379 N.J. Super. 331, 341-42 (App. Div. 2005)). An agency may not, however, "use its power to interpret its own regulations as a means of amending those regulations or adopting new regulations." Venuti v. Cape May Cnty. Constr. Bd. of Appeals, 231 N.J. Super. 546, 554 (App. Div. 1989). "[N]o matter how great a deference the court is obliged to accord the administrative determination which it is being called upon to review, it has no capacity to

review at all unless there is some kind of reasonable factual record developed by the administrative agency and the agency has stated its reasons grounded in that record for its action." In re Issuance of a Permit by Dep't of Env't Prot. to Ciba-Geigy Corp., 120 N.J. 164, 173 (1990) (quoting State v. Atley, 157 N.J. Super. 157, 163 (App. Div. 1978)).

Any review of this record makes it readily apparent that the Department failed to make any finding in issuing the 2020 permit that Hartz's project complied with the requirements of N.J.A.C. 7:7-15.14(b)(4), and that the record, as it existed when the Department issued the permit, lacked sufficient evidence to allow it to do so. See In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013) (explaining "the arbitrary, capricious, or unreasonable standard applicable in the review of administrative agency decisions subsumes the need to find sufficient support in the record to sustain the decision").

Hartz's supplementation of the record on remand with new street and aerial drone photos with superimposed renderings of the project taken from near-by residential buildings and roads, including Rock Eagle's building — without the opportunity for interested parties to take their own photos of their own views for submission to and evaluation by the Department — allowed the

Department to make new findings, and in essence, to allow Hartz to backfill its permit application without public notice.[8]  It was not our intent in granting the Department's request to remand for our order to become "an instrument of mischief"; we shall not allow it to continue.  See CBS Outdoor, 414 N.J. Super. at 587.

Our disposition makes discussion of Rock Eagle's remaining issues unnecessary.  The decision on remand is reversed and the individual waterfront permit, as modified, is vacated in its entirety.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[8]  We note those submissions, which Rock Eagle claims are "cherry-picked," providing a distorted vision of the views affected from neighboring residential buildings, and no views from the elevated section of Park Avenue, a public street, only allowed the Department to conclude that "while some views of the Hudson River and the New York City skyline are blocked due to the proposed structures, a majority of the river and skyline's view is still available along Harbor Boulevard," a road owned by Hartz, and that the views of walkers and joggers along the Hudson River Waterfront Walkway of the River and the New York skyline on the river side of the project, remain unobstructed.

A-4009-19